**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 4 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EDUCATIONAL CREDIT
MANAGEMENT CORPORATION,
assignee of USA Group Loan Services,
Inc.,

      Defendant - Appellant,

v.

NANCY JANE POLLEYS,

      Plaintiff - Appellee.

No. 02-8059

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 00-CV-215-D)**

---

Submitted on the briefs:[*]

Scott M. Browning and Craig R. Welling, Rothgerber, Johnson & Lyons, L.L.P.,
Denver, Colorado, for Appellant.

Stephen R. Winship, Winship & Winship, P.C., Casper, Wyoming, for Appellee.

---

Before **KELLY**, **HENRY**, and **LUCERO**, Circuit Judges.

---

    [*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1 (G). The cause therefore
is ordered submitted without oral argument.

**KELLY**, Circuit Judge.

Plaintiff-Appellee Nancy Jane Polleys sought a bankruptcy court discharge of federally guaranteed student loans. Defendant-Appellant Education Credit Management Corporation ("ECMC") is a non-profit company and fiduciary of the Department of Education that is charged with collecting such loans. It now holds these loans. Ms. Polleys initiated an adversary proceeding in bankruptcy, contending that the loans were dischargeable because payment of them would impose an undue hardship within the meaning of 11 U.S.C. § 523(a)(8). The bankruptcy court agreed and discharged the loans. The district court affirmed. ECMC now appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

Background

At the time of trial, Ms. Polleys was a 45-year old single mother of a teenaged girl. In 1993, she obtained a degree in accounting financed with student loan funds. She has not repaid any amount on these loans. Her loans were later consolidated, and at the time of trial had a balance of approximately $51,000; repayment would require $420 per month over a period of 20 years. Aplt. App. 187.

- 2 -

Ms. Polleys was previously employed as an accountant. In 1994, she worked for one year in that capacity and earned $33,000. She had a job in public accounting in 1997, earning $13,771. According to Ms. Polleys, she was laid off from that job when the employer realized she was taking antidepressant medication and she asked for too much help. Ms. Polleys also tried self-employment, but could only get small bookkeeping jobs that paid less than $400 per month.

Since 1997, Ms. Polleys's annual income has been as high as $16,000 and as low as $3,000. Through August 2000, she earned minimum wage while employed at a greenhouse until she was laid off. Recently, Ms. Polleys and her daughter have lived on about $9,800, obtained from child support and two or three part-time jobs. Ms. Polleys receives $400 per month in child support payments.

Ms. Polleys and her daughter live in a rental property owned by her parents and pay no rent or utilities. She has a 1993 Subaru, which has significant body damage, but owns very little other property and no real property. Her budget contains no funds for emergencies. She qualifies for food stamps, and her income is below the federal poverty guidelines, as it was in the year before trial. Aplt. App. at 48, 128-29. Although her daughter is eligible for Medicaid, Ms. Polleys herself has no health insurance. She expects to receive unemployment

compensation at some point in the future.

Ms. Polleys is apparently in good physical health, but she has been diagnosed with and continues to suffer from a psychological condition known as "cyclothymic disorder." She was once involuntarily committed. Aplt. App. at 32, 168. Ms. Polleys is currently prescribed Serzone, an antidepressant, twice a day. Aplt. App. at 132. Her mental health condition also apparently resulted in a suicide attempt. Aplt. App. at 24-27, 30-31, 159. She has ongoing expenses for her various medical and psychological conditions. Aplt. App. at 132-32.

On appeal, ECMC argues that the district court and the bankruptcy court not only selected the wrong standard for an undue hardship discharge, but also applied it incorrectly. Rather than relying upon a "totality of the circumstances" test, ECMC argues that the courts should have looked to the three-part test in Brunner v. New York State Higher Education Services Corp., 831 F.2d 395, 396 (2d Cir. 1987), and concluded that Ms. Polleys was not entitled to a discharge.

## Discussion

Section 523(a)(8) provides that an educational loan is not dischargeable in bankruptcy unless "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." While this court is obliged to accept the bankruptcy court's undisturbed findings of fact unless they are

clearly erroneous, we review de novo conclusions as to the legal effect of those findings. United States v. Richman (In re Talbot), 124 F.3d 1201, 1206 (10th Cir. 1997). Whether a debtor's student loans would impose an "undue hardship" under 11 U.S.C. § 523(a)(8) is a question of law. Woodcock v. Chemical Bank, NYSHESC (In re Woodcock), 45 F.3d 363, 367 (10th Cir. 1995). It requires a conclusion regarding the legal effect of the bankruptcy court's findings as to the debtor's circumstances, and is therefore reviewed de novo. Id.; see also Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 553 (8th Cir. 2003) (collecting cases).

A.    Undue Hardship Standard

The bankruptcy code does not define "undue hardship," nor has the Tenth Circuit designated a test for the determination of the term. In an unpublished decision, Cuenca v. Department of Education, No. 94-2277, 1995 WL 499511, at *2 (10th Cir. Aug. 23, 1995), we noted that undue hardship is something more than inconvenience or doing without luxuries, stating that "the discharge of a student loan should be based upon an inability to earn and not simply a reduced standard of living."

The court in Cuenca found that the debtor earned $36,000 per year, his wife did not work, he was not burdened with a number of old debts, and that he had derived a benefit from his education. In refusing to discharge the debtor's student

loan, the court stated, "Mr. Cuenca's income is not at or below poverty level. Many families would be envious of his annual income." Id.

In enacting § 523(a)(8), Congress was primarily concerned about abusive student debtors and protecting the solvency of student loan programs. See In re Andresen, 232 B.R. 127, 137 (B.A.P. 8th Cir. 1999). Congress itself had little to say on the dischargeability of student loans. The phrase "undue hardship" was lifted verbatim from the draft bill proposed by the Commission on the Bankruptcy Laws of the United States. The Commission noted that the reason for the Code provision was a "rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of educational loan debts." Report of the Comm'n on the Bankr. Laws of the United States, H.R. Doc. No. 93- 137, Pt. II § 4-506 (1973), reprinted in Collier on Bankruptcy, App. Pt. 4(c) at 4-710 (15th ed. rev. 2003) [hereinafter Commission Report]. Upon graduation, the typical student has little or no non-exempt property that can be distributed to creditors, but may have substantial future earning potential. Section 523(a)(8) was designed to remove the temptation of recent graduates to use the bankruptcy system as a low-cost method of unencumbering future earnings.

These bankruptcies contravened the general policy that "a loan . . . that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any

reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt." Id. The Commission implemented this policy by recommending the delay of dischargeability for five years,[1] a time period that "gives the debtor an opportunity to try to meet his payment obligation." Id. at 4-711. After five years, the exception would be lifted in recognition of the fact that "in some circumstances the debtor, because of factors beyond his reasonable control, may be unable to earn an income adequate both to meet the living costs of himself and his dependents and to make the educational debt payments." Id. During the first five years, however, a student loan could only be discharged if its payment would impose an "undue hardship" on the debtor.

The Commission noted that in order to determine whether nondischargeability of the debt will impose an "undue hardship,"

> the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the

---

[1]After the enactment of the Higher Education Amendments of 1998, Pub. L. No. 105-244, 112 Stat. 1837 (1998), student loan debts are no longer automatically dischargeable after five years. Thus, only the "undue hardship" exception to nondischargeability currently exists. See infra note 2.

education debt.

Id.

The various courts of appeals that have applied the undue hardship provision of § 523(a)(8) have adopted two tests. Most circuits have adopted a version of the Second Circuit's three-factored test in Brunner v. New York State Higher Education Services Corp., 831 F.2d 395, 396 (2d Cir. 1987). See United States Dep't of Educ. v. Gerhardt (In re Gerhardt), 348 F.3d 89, 91 (5th Cir. 2003); Hemar Ins. Corp. of Am. v. Cox (In re Cox), 338 F.3d 1238, 1241 (11th Cir. 2003); United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1114 (9th Cir. 1998); Penn. Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1995); Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman), 25 F.3d 356, 359-60 (6th Cir. 1994); In re Roberson, 999 F.2d 1132, 1135-36 (7th Cir. 1993). The Eighth Circuit has instead adopted a totality of the circumstances test in determining undue hardship. See Andrews v. S.D. Student Loan Assistance Corp. (In re Andrews), 661 F.2d 702, 704 (8th Cir. 1981); see also In re Long, 322 F.3d at 554.

The three-part Brunner test requires the debtor to prove:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to

repay the loans.

831 F.2d at 396. Under the Brunner analysis, if the court finds against the debtor on any of the three parts, the inquiry ends and the student loan is not dischargeable. Id.

The facts in Brunner weighed heavily against the debtor, and thus the court refused to discharge the student loan. The debtor was not disabled or elderly and had no dependents. She was also skilled and well educated. She did not recount to the court any specific jobs that she had sought and been refused, and did not attempt to find a job outside of her chosen field of work. She only had $9,000 of student loan debt, but two months prior to the bankruptcy hearing, she withdrew $2,400 from her savings to buy a car. Moreover, she filed for discharge within a month of the date the first payment of the loans came due, made virtually no attempt to repay, and did not request a deferment of payment. Brunner v. N.Y. State Higher Educ. Svcs. Corp. (In re Brunner), 46 B.R. 752, 758 (S.D.N.Y. 1985).[2]

_____

[2]It should also be noted that the Bankruptcy court decision to which the Brunner undue hardship test applied was based on the Bankruptcy Code as it existed in 1985, which still provided for an automatic discharge for five-year-old student loans that could not be repaid. See Brunner, 46 B.R. at 753. Thus, even if debtors could not establish undue hardship in repaying the student loan, they would still be able to obtain discharge of student loans if they merely filed for bankruptcy after five years from when the repayments of their loans began.

In 1998, however, the Higher Education Amendments of 1998 eliminated the automatic dischargeability of student loans, leaving only the undue hardship

Many subsequent courts employing the Brunner analysis, however, appear to have constrained the three Brunner requirements to deny discharge under even the most dire circumstances.  See, e.g., Healey v. Mass. Higher Educ. (In re Healey), 161 B.R. 389, 395 (E.D. Mich. 1993) (debtor failed first Brunner prong, because, although she was unable to maintain a "minimal" standard of living on her current income, she did not demonstrate that she was "making a strenuous effort to maximize her personal income within the practical limitations of her vocational profile"); In re Walcott, 185 B.R. 721, 723-24 (Bankr. E.D.N.C. 1995) (debtor failed second Brunner prong because, since a $9.00 per hour position teaching literacy classes was "the highest hourly wage she has ever earned," "her current prospects appear brighter than at nearly any other time since her graduation"); In re Roberson, 999 F.2d at 1137 (debtor, who was divorced, unemployed, and living in a one-room apartment that did not have even a kitchen or toilet, failed second Brunner prong because he did not present a "certainty of hopelessness"); In re Stebbins-Hopf, 176 B.R. 784, 788 (Bankr. W.D. Tex. 1994) (debtor, who had nerve damage, bronchitis, and arthritis, and whose daughter had epilepsy, mother had cancer, and grandchildren had asthma, failed good faith prong because "[s]he intentionally chose to help her family financially").

exception to nondischargeability.  The repeal of the five-year discharge (which at that time had been lengthened to seven years) means that a debtor's only chance of discharging her student loans is by proving "undue hardship."

These applications show that an overly restrictive interpretation of the Brunner test fails to further the Bankruptcy Code's goal of providing a "fresh start" for the honest but unfortunate debtor, Stellwagen v. Clum, 245 U.S. 605, 617 (1918), and can cause harsh results for individuals seeking to discharge their student loans.

Under the Eighth Circuit's "totality of the circumstances" test for undue hardship, bankruptcy courts should consider:

> (1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt-while still allowing for a minimal standard of living-then the debt should not be discharged.

Id. at 554-55 (citations omitted).

Relevant factors that different courts consider when examining the totality of circumstances of a debtor's situation include, but are not limited to, whether the debtor has made a good faith effort to negotiate a deferment of payment; whether the hardship will be long-term; whether the debtor has made any payments of the student loans; whether a debtor is permanently or temporarily disabled; whether the debtor has tried to maximize income and minimize expenses; whether the debtor has an ability to obtain gainful employment in her area of study; and the ratio of the student loan to the total indebtedness. See

Lawson v. Hemar Serv. Corp. of Am. (In re Lawson), 190 B.R. 955, 957 (Bankr. M.D. Fla. 1995).

According to the Eighth Circuit, the totality of the circumstances test is a "less restrictive approach" than the Brunner test. Long, 322 F.3d at 554. It recognizes the "inherent discretion" contained in § 523(a)(8), and allows "each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy." Id.; see also In re Johnson, 121 B.R. 91, 93 (Bankr. N.D. Okla. 1990) ("Rigid adherence . . . to a particular test robs the court of the discretion envisioned by Congress in drafting [§ 523(a)(8)].").  It has also been suggested that the totality of circumstances test better considers the debtor's situation in light of the "fresh start" policies of § 523(a)(8), because it does not let a single factor become dispositive against a finding of undue hardship. See, e.g., In re Afflitto, 273 B.R. 162, 170 (Bankr. W.D. Tenn. 2001); In re Law, 159 B.R. 287, 292-93 (Bankr. D.S.D. 1993).

On the other hand, it is not necessarily true that a totality of circumstances analysis of each debtor's situation avoids the harshness of the Brunner analysis. Under this standard, courts may choose from a multitude of factors and apply any combination of them to a given case, suggesting that just about anything the parties may want to offer may be worthy of consideration. As a result, it has an unfortunate tendency to generate lists of factors that should be considered–lists

that grow ever longer as the case law develops. See, e.g., In re Smither, 194 B.R. 102, 111 (Bankr. W.D. Ky. 1996) (noting 11 non-exclusive factors a court must consider). "Legal rules have value only to the extent they guide primary conduct or the exercise of judicial discretion. Laundry lists, which may show ingenuity in imagining what could be relevant but do not assign weights or consequences to the factors, flunk the test of utility." In re Plunkett, 82 F.3d 738, 741 (7th Cir. 1996).

An ad hoc, totality-of-the-circumstances approach has been justified as more in accordance with legislative intent. See, e.g., Wilson v. Mo. Higher Educ. Loan Auth., 177 B.R. 246, 248 (Bankr. E.D. Va. 1994) ("Each undue hardship discharge must rest on its own facts."). It is correct to state that Congress wanted undue hardship to be a fact-specific standard. As a practical matter, however, the two tests will often consider similar information–the debtor's current and prospective financial situation in relation to the educational debt and the debtor's efforts at repayment.

We do not read Brunner to rule out consideration of all the facts and circumstances. Under the first aspect of Brunner, the bankruptcy court is to inquire about whether the debtor can maintain a minimal standard of living while repaying the debt. This evaluation necessarily entails an analysis of all relevant factors, including the health of the debtor and any of his dependents and the

debtor's education and skill level. The second <u>Brunner</u> factor similarly requires an analysis of all the facts and circumstances that affect the debtor's future financial position. Finally, the good faith part includes an analysis of the debtor's situation in order to determine whether he has made a good faith attempt to repay the loan by maximizing income and minimizing expenses.

We therefore join the majority of the other circuits in adopting the <u>Brunner</u> framework. However, to better advance the Bankruptcy Code's "fresh start" policy, and to provide judges with the discretion to weigh all the relevant considerations, the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged. Additionally, we think that the good faith portion of the <u>Brunner</u> test should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship.

The first part of <u>Brunner</u>–that the debtor cannot maintain a minimal standard of living while repaying the student loan debt–comports with the legislative policy behind § 523(a)(8), that student loans "should not as a matter of policy be dischargeable before [the debtor] has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt." Commission Report, <u>supra</u>, at 4-710. This first part should serve as the starting point for the undue hardship inquiry because

information regarding a debtor's current financial situation generally will be concrete and readily obtainable.

The second <u>Brunner</u> element, which requires that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans, properly recognizes that a student loan is "viewed as a mortgage on the debtor's future." <u>Id.</u> However, in applying this prong, courts need not require a "certainty of hopelessness." Instead, a realistic look must be made into debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like. Importantly, "courts should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism," and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan. Robert F. Salvin, <u>Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?</u>, 71 Tul. L. Rev. 139, 197 (1996).

Finally, an inquiry into a debtor's good faith should focus on questions surrounding the legitimacy of the basis for seeking a discharge. For instance, a debtor who willfully contrives a hardship in order to discharge student loans should be deemed to be acting in bad faith. Good faith, however, should not be used as a means for courts to impose their own values on a debtor's life choices.

B.     Did Ms. Polleys Establish Undue Hardship?

Normally, we would remand for the bankruptcy court to apply the test we announce today. Such a remand is unnecessary because the bankruptcy court's factual findings are sufficiently complete to decide the undue hardship issue.

ECMC apparently does not dispute the bankruptcy court's implicit finding that Ms. Polleys satisfied the first part of the Brunner test, that she cannot maintain a minimal standard of living while repaying the student loan debt. As the bankruptcy court found, Ms. Polleys "has no discretionary income, lives at the largesse of her parents, and is unemployed." Bankr. Ct. Opin. at 4.

ECMC argues that Ms. Polleys cannot satisfy the second Brunner part–that circumstances indicate that her state of affairs is likely to persist for a significant portion of the repayment period of the student loans–because she cannot prove that she has a medical disability. ECMC, however, ignores the bankruptcy court's extensive findings of Ms. Polleys's emotional health. The court found that Ms. Polleys "suffers from debilitating emotional problems which, though counterproductive, are obviously out of her control." Id. Moreover, "medication was necessary for her to function, but that medication affected her memory and communication skills negatively." Id. Ms. Polleys's "inability to hold a job due to emotional outburst and a low tolerance for stress is not a problem of her own making, but affects her ability to earn more than a nominal living." Id. This

condition is "likely to persist into the foreseeable future, and even with a modest improvement in income [there is] no way that Ms. Polleys can repay $51,000 plus accruing interest." Id.

Ms. Polleys's mental health problems are at least as substantial and long lasting as the disability the Ninth Circuit found to be sufficient to preclude the debtor from paying her student loan in In re Pena, 155 F.3d 1108 (9th Cir. 1998). In Pena, the court held that the debtor's depression "prevent[ed] long-term stability" and was "likely [to] continue to interfere with her ability to work." Id. at 1113.

The fact that Ms. Polleys stipulated that she "has no medical or physical condition that prevents her from retaining work" does not carry the day for ECMC. D. Ct. Opin. at 5. Ms. Polleys did not stipulate that she has no medical condition that affects her ability to work or earn a substantial income. The bankruptcy court found just the opposite and its findings are not clearly erroneous.

More fundamentally, although ECMC argues that "typically, prospective undue hardship is proven by medical disability," Aplt. Br. at 25 (emphasis added), the cases do not suggest that a permanent medical disability is any kind of prerequisite to discharging a student loan debt. In In re Cheesman, 25 F.3d 356 (6th Cir. 1994), there was no evidence of any medical problems. The wife had

- 17 -

lost her job after she took a maternity leave; the husband earned a gross salary of $1,123 per month. Although the husband was hoping for a promotion at his current job, and the wife was actively seeking employment, the court noted that there was "no assurance . . . that either will obtain their objectives," id. at 360, and that the Cheesmans were headed "in a downward spiral and will continue to go deeper in debt," id. at 359. Thus, although a permanent medical condition will certainly contribute to the unlikelihood of a debtor earning enough money to repay her student loan debt, it is by no means necessary if the debtor's situation is already bleak.

Additionally, ECMC's reliance on In re Brightful, 267 F.3d 324 (3d Cir. 2001), for the proposition that a debtor must show "additional circumstances" to support a discharge is misplaced. In Brightful, the bankruptcy court made no finding of the "nature of Brightful's emotional and psychiatric problems, or how these problems prevent her from being gainfully employed." Id. at 330. In contrast to Ms. Polleys's situation, Brightful was "intelligent, physically healthy, currently employed, possesses useful skills as a legal secretary, and has no extraordinary, non-discretionary expenses." Id. Moreover, Brightful's only daughter was just two years away from the age of majority, and therefore Brightful's obligation to support her was nearly at an end. Id.

Finally, the facts indicate that Ms. Polleys is seeking to discharge her

student loan debt in good faith. ECMC admits that the good faith inquiry requires determining whether a debtor's circumstances are the result of "factors beyond her reasonable control." Aplt. Br. at 30. However, ECMC bases its claim of lack of good faith only on (1) the fact that Ms. Polleys has never made a single payment on her student loans, and (2) her decision to leave a good paying job and move to Wyoming to live with her parents.

First, the failure to make a payment, standing alone, does not establish a lack of good faith. See In re Coats, 214 B.R. 397, 405 (Bankr. N.D. Okla. 1997) ("There is no per se requirement that a debtor pay a certain percentage or minimum amount of the loans at issue in order to meet the good faith requirement."). Additionally, unlike in Brunner, where the debtor "filed for discharge within a month of the date for the first payment of her loans came due . . . [and never] requested a deferment of payment," 46 B.R. at 758, Ms. Polleys did not immediately seek to discharge her student loan obligation after it came due. Rather, she consolidated the loan, and entered into the deferral programs. When the student loan creditors demanded payments of $800.00 per month, she tried to negotiate with them. Ms. Polleys's efforts to cooperate with her lenders shows that she was acting in good faith in working out a repayment plan.

Moreover, the good faith part can be satisfied by a showing that Ms. Polleys is actively minimizing current household living expenses and maximizing

personal and professional resources. In re Woodcock, 149 B.R. 957, 961 (Bankr. D. Colo. 1993). Ms. Polleys could do little more to minimize her current household living expenses: she lives in a basement apartment in her parents' home, and pays no rent or utilities other than her phone bill. Any failure on her part to maximize her personal and professional resources is due to her mental health condition, which is beyond her control.

Finally, there is no indication that Ms. Polleys is "attempting to abuse the student loan system by having [her] loans forgiven before embarking on lucrative careers in the private sector." Cheesman, 25 F.3d at 360. On the contrary, Ms. Polleys has tried to use her education to maximize her income. She has tried to work for accounting firms, to no avail. Then she tried to open her own accounting practice, and that failed too. She has not been able to pass the CPA Exam despite several attempts. Additionally, Ms. Polleys has even sought employment outside her accounting field, only to be laid off from her last job in a local nursery. It is clear that Ms. Polleys has been trying her best in good faith to become financially independent, but that circumstances beyond her control are keeping her from reaching that goal. In light of these factors, Ms. Polleys meets the "undue hardship" requirement of § 523(a)(8).

AFFIRMED.

No. 02-8059, Educational Credit Management Corporation v. Polleys.

LUCERO, J., concurring.

Every month millions of young Americans who have availed themselves of the type of student loan program at issue here faithfully make their payments. It is beyond dispute that the level of sacrifice required to make these payments is a great one; many no doubt make such payments even when they consider the burden an "undue hardship." It is important that the student loan program operate free of the cynicism that would infest the system if a disparate standard for discharge of loans would develop, leaving some students enduring the hardship of making loan payments while others are freed of their commitment on a floating standard. Because this case appears to be exceptional, I concur in the result reached by my esteemed colleagues.

I write separately because I disagree with the majority's adoption of Brunner's second prong, which requires "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395, 396 (2d Cir. 1987). I disagree as to two aspects of the second prong: (1) the nature of the evidence of medical disability that we should require of debtors who seek to discharge their student loans based on medical conditions; and (2) the evidence required regarding the likely duration

- 1 -

of the circumstances giving rise to "undue hardship."

As to the first issue, I am concerned that the majority opinion fails to enunciate a clear standard to measure "undue hardship" when a debtor asserts a medical disability as evidence. I would replace Brunner's more subjective second prong with an objective standard for determination of medical disability, requiring that the bankruptcy court consider only evidence that rises to a level of "reasonable medical probability."

The "reasonable medical probability" standard is not a novel one; in fact, it is ubiquitous in other contexts in both federal and state law. See, e.g., St. Anthony Hosp. v. U.S. Dep't. of Health and Human Servs., 309 F.3d 680, 694 (10th Cir. 2002) (applying a statutory "reasonable medical probability" standard in the context of the Emergency Medical Treatment and Labor Act's "reverse-dumping" provisions); LeMaire v. United States, 826 F.2d 949, 954 (10th Cir. 1987) (concluding that Colorado law required that medical opinions be founded on "reasonable medical probability" in order to be admissible); Houser v. Eckhardt, 450 P.2d 664, 668 (Colo. 1969) (concluding that "[a] medical opinion is admissible if founded on reasonable medical probability").

With respect to the issue of duration of the circumstances, the majority requires that the disability last for a "significant period of the loan." It is my view that "significant period" is not sufficiently defined and is likely to lead to

inconsistent outcomes.  I would therefore reject this subjective inquiry and instead require an objective standard for determination of the duration requirement, leaving it to the medical experts to declare whether the disability will or will not extend for the duration of the loan.  What is needed is legislation which excuses the payment of loans during periods of disability; however, in the absence of such legislation, bankruptcy courts ought to discharge student loans only when the medical record is clear that the disability involved is an enduring one.

Of course, factors other than medical disability can and should be taken into consideration in making the ultimate decision as to whether a debtor's circumstances constitute "undue hardship" and warrant the discharge of a loan. To the extent that the decision is based on a medical disability determination, however, those medical factors should be based on objective rather than subjective criteria.