In re Jerome MANDALA, Patricia Deen Mandala, Debtors.

Patricia Deen Mandala, Plaintiff,

v.

Educational Credit Management Corporation, Defendant.

Bankruptcy No. 02–15414.
Adversary No. 03–5116.

United States Bankruptcy Court, D. Kansas.

May 25, 2004.

Michael J. Studtmann, Wichita, KS, for debtors.

Emily B. Metzger, Wichita, KS, Bruce A. Swenson, Derby, KS, N. Larry Bork, Topeka, KS, for defendants.

Laurie Williams, Wichita, KS, trustee.

### *MEMORANDUM OPINION*

ROBERT E. NUGENT, Chief Judge.

Debtor Patricia Deen Mandala filed this adversary proceeding to obtain an "undue hardship" discharge of her student loan debts owed to Educational Credit Management Corporation (ECMC) under 11 U.S.C. § 523(a)(8). After an evidentiary hearing in which the Court heard the testimony of debtors Patricia Deen Mandala (Patricia) and Jerome Mandala (Jerome) and received numerous exhibits, referenced as necessary below, the Court reviewed and takes judicial notice of the debtors' case file in the lead bankruptcy case as well as in the debtors' prior bank-

ruptcy case, Case No. 97–11480–13. From this rather extensive record, the Court makes the following findings of fact and conclusions of law as required by Fed. R.Civ.P. 52 as it applies to adversary proceedings under Fed. R. Bankr.P. 7052.

### Jurisdiction and Venue

The Court has jurisdiction over this proceeding.[1] This adversary proceeding is a core proceeding.[2] Venue is properly laid in this District.

### Debtors' Background and Standard of Living

At the time of trial, Patricia was 54 years old and Jerome was 56. The loans to which ECMC has succeeded were incurred by Patricia in pursuit of her education at Friends University and Colorado Institute of Art between 1986 and 1991. The amount borrowed was $39,142.33. As of April 7, 2004, the balance of the three loans, which apparently includes deferred interest and costs, is as follows.[3]

| Loan No. | Amt. Disbursed | Interest Rate | Interest Per Diem | Amount Due |
|---|---|---|---|---|
| 1 | $ 4,000.00 | variable 4.2% | $ 0.10 | $ 1,624.20 |
| 2 | $ 33,142.33 | fixed 9.0% | $12.22 | $ 69,054.23 [4] |
| 3 | $ 2,000.00 | variable 4.2% | $ 0.72 | $ 8,283.54 |
| Total | | | | $ 78,961.97 |

Debtors do not dispute these amounts. ECMC has agreed, however, to accept $56,639.39 as full payment of this obligation. The total amount of scheduled unsecured debt in this case is $64,501.24.

The proceeds of these loans funded Patricia's pursuit of a Bachelor of Science degree in Education at Friends. She commenced her studies when she was approximately 36 years old and received that degree in 1991 after five years of study. No mention of Colorado Institute of Art was made at trial although the exhibits reveal that this was the school for the $4,000 loan.[5] After Patricia graduated from college, she taught in the Catholic Diocese of Wichita school system for four years. When her contract there was not renewed, she began substituting on a long-term basis at Wichita Heights High School and later became a full-time tenured teacher at Jardine Middle School.[6] Patricia is certified to teach music and language arts. She currently teaches language arts because she developed carpal tunnel syndrome which prevents her from playing the piano in class.

Patricia's most recent pay stub placed in evidence was for the month of April, 2003.[7] At that time, Jardine was privately operated by the Edison Company, and not directly run by Unified School District 259. Per that pay stub, Patricia was being paid a gross salary of $2,779.52 per month on a 12–month contract. In addition, she was paid extra for being a reading and writing assessment "rater," receiving roughly $432

---

1. 28 U.S.C. § 1334.

2. 28 U.S.C. § 157(b)(2)(I).

3. *See* ECMC Ex. C.

4. Loan No. 2 appears to be a consolidation of prior loans. The consolidation occurred in 1994. *See also,* Debtors' Ex. 7, Interrogatory No. 13.

5. *See* ECMC Ex. A.

6. Patricia has held a teaching position at Jardine Middle School since August 1998. *See* Debtors' Ex. 7, Interrogatory No. 4.

7. *See* ECMC Ex. E.

per month. In that month she also received $238.81 in "Temporary Leave" pay. Nothing in the record suggests that she receives that pay on a regular monthly basis. She also received as benefits the USD 259 medical/dental plan for which the District paid $430 per month as well as life insurance premiums in the amount of about $26 per month. Deducted from her check that month were federal and state taxes of $663.75 as well as $200 placed in a § 408(b)(3) teacher's annuity (like a § 401k plan)("TSA"), a $138 mandatory payment to KPERS (the state employees' retirement system), and $400 to a flexible spending account ("FSA") for use in paying medical expenses with pre-tax income. After these withholdings, her take-home pay for that month was $2,048.57.

Edison no longer contracts with USD 259 to operate Jardine Middle School. Fortunately, Patricia was hired by the District and retained her position. Unfortunately, she did not provide the Court with a pay stub from USD 259 for the current 2003–04 academic year. In her testimony, Patricia stated that her salary was somewhat reduced from that which Edison had previously paid her. Edison teachers apparently taught for ten months each year while USD 259 teachers only teach for nine months. Patricia testified that her monthly salary is approximately $2,700 plus the $432 per month she receives for being a "rater." This amounts to a gross wage of $3,132. The Court is left to interpolate what her deductions might be. Because this salary is only a little lower than the Edison contract provided, the Court

will assume that the taxes deducted would be no more than $663.75 per month. Patricia stated that she has discontinued the deduction for her TSA, but that she participates in KPERS and continues to contribute to her FSA. If the Court assumes that she withholds an additional $538.01 (KPERS $138.01 + FSA $400), her net salary amounts to $1,930.24. Patricia suggests that she may not receive the supplemental income provided by her "rater" assignment next year, but there is no evidence upon which the Court can make a finding either way. Thus, the Court concludes that Patricia's current take home pay is approximately $118 per month less than in 2003. According to the debtors' income tax returns, they have filed as married filing jointly. Patricia reported wages of $31,412 in 2001, $33,161 in 2002, and $34,221 in 2003.[8] The debtors received federal income tax refunds of $699 in 2001 and $648 in 2003, but owed $689 in 2002. According to Patricia's April 2003 pay stub, she avails herself of one allowance, as though she were single.[9] Presumably, this reduces her take-home pay, but there is no evidence as to what degree.

Jerome Mandala, 56, is permanently disabled, having fallen in 1979 and broken his back. He suffers from spinal stenosis which he says is a steadily degenerating condition. At the time of trial, he was on Social Security disability and received $8,712 a year or $726 net per month.[10] According to debtors' tax returns, Jerome received social security benefits of $8,904 in 2001, $9,120 in 2002, and $9,980 in 2003, a portion of which was presumably repaid

---

8. *See* Debtors' Ex. 1, 2, and 3.

9. The previous months' pay stubs reflect that Patricia claimed no allowances while listing her marital status as single for tax withholding purposes. Patricia stated that their tax preparer advised them to change her withholding allowance.

10. From Jerome's gross social security disability payment, $106 a month was repaid to the Government for Medicare A and B insurance.

for Medicare insurance. Jerome last worked in 1991 at which time he was a sales manager for RainSoft. He made between $30,000 and $35,000 a year in that job. Jerome also suffers from Type II diabetes, has had a heart attack in the last few years, and suffers from liver and kidney problems. He did not appear to the Court to be enjoying good health at trial.

Jerome takes a steady stream of medications, some prescribed and covered by insurance, and some not.[11] His treating physician, D. Stanley Kardatzke, M.D., did not testify, but according to Jerome, Kardatzke has "recommended" Jerome take numerous vitamin supplements for which he pays between $450 and $500 out-of-pocket each month. These supplements are apparently not covered by insurance, nor are they reimbursable expenses under Patricia's FSA. Jerome also takes prescription medications for which debtors pay a deductible monthly in the $200 to $250 range. Patricia's medical coverage through the school district provides for a graduated drug reimbursement depending upon whether the drugs are available in generic form. Two of the drugs Jerome takes for his diabetes, Glucophage and Prandin, are apparently unavailable in generic form. In addition to his vitamin and prescription drug expense, Jerome budgets approximately $100 a month for doctor visits which he says are necessary to monitor his various conditions.

According to debtors' prescription drug records,[12] Patricia utilized prescription drugs costing on average between $100 and $130 per month between September 2001 and May 2003. These records also demonstrate that Jerome used prescription drugs costing on average between $112 and $147 per month during the same period. This substantiates the prescription drug portion of the debtors' medical budget.

Other than Jerome's and Patricia's testimony, there is no support for the cost or the medical efficacy of the vitamin regimen. The debtors did not specifically identify the kind of vitamins or supplements Jerome took. Jerome essentially testified that he tried different vitamins and reported his results to Dr. Kardatzke who, in turn, either encouraged or dismissed their use.

Patricia and Jerome live in a home in west Wichita that they purchased in 1986. Jerome testified that the most recent property tax value of the home was $82,000. Based on their interrogatory responses, debtors valued the 2–bedroom home at $70,000.[13] There remains approximately $37,452 due and owing on their mortgage.[14] According to the interrogatories and Schedule J, debtors' house payment is $782.50, some portion of which is for taxes and insurance.[15] Jerome testified he had another 16–17 years remaining to pay on the mortgage and that they refinanced the original thirty year loan in 2000. Jerome did not disclose the term of the 2000 loan. Their lender, Standard Mortgage, has filed no proof of claim in this case. However, in debtors' 1997 bankruptcy case, Standard filed a proof of

---

11. Jerome testified that these medications run approximately $700 a month, $250/month for prescription medications and $450/month for vitamins and supplements.

12. Debtors' Ex. 6.

13. Debtors' Ex. 7, Interrogatory No. 15.

14. Debtors' Ex. 7, Interrogatory No. 24. This is the debtors only secured debt.

15. Debtors' Ex. 7 Interrogatory No. 3. According to Jerome's testimony at trial, the current mortgage payment is now between $810 and $820 a month with $350 of that amount going toward principal and interest.

claim for $49,039.79, showing a 1994 30–year mortgage note at 8% interest with an opening balance of approximately $52,000 and requiring a monthly principal and interest payment of $382.72, the final amounts becoming due and payable in April of 2024.[16] Unfortunately, the Court received no evidence about the precise makeup of the current $782.70 mortgage payment, other than Jerome's testimony that the principal and interest portion was approximately $350 and the taxes and insurance were $200. Nor is there any clear evidence of the terms of the refinancing, other than a lower rate of interest. Taken in sum, this suggests that debtors are prepaying an additional $200 principal per month. If this is the case, at a note rate of eight per cent, the loan will pay out in roughly 121 payments from now, or ten years, one year before Patricia is scheduled to retire.

Jerome testified that the home was in some disrepair, needing foundation work. The house has recently been painted, some windows and doors have been replaced, and both the well pump and water heater have been replaced. The roof has also been replaced.

The debtors own two cars, a 1990 Ford Taurus and a 1986 Plymouth Caravelle. According to Patricia's testimony, the Ford is inoperative, but she does not know why. She drives the Plymouth to work some 11 miles each way. The Court estimates this would result in about 4,000 miles driven to work over nine months (180 school days × 11 miles × 2) and assumes that both debtors drive other places for necessary shopping and other purposes. There is no evidence in the record of actual car expense, but the debtors budget some $250 per month for transportation. Given the age of these vehicles and the likelihood debtors will need to replace one of them in the near future, the $250 budget item is justifiable.

Several of debtors' budget items merit additional scrutiny.[17] As noted above, the Court suspects debtors are paying their mortgage in advance with the understandable goal of paying off their home before retirement. They allocate $150 per month for home maintenance. Jerome's testimony on this suggests that he arrived at this number by adding up the cost of various repairs as well as purchases such as appliances, and dividing that total by the months they have lived in the home. This amount seems high. Debtors' phone bill of $100 is also high. Patricia testified that the debtors had not considered a long distance plan or the acquisition of a cell phone with free long distance.

Debtors' food budget for two people, with no dining out, is $550 ($500 per Schedule J). ECMC offered the USDA's "Official Food Plans" into evidence.[18] This USDA document states that the "thrifty" food plan for a family of two should cost $275.40 per month. The "liberal" food plan for the same family should cost $529.50. Even without the Official Food Plan in evidence, the Court's own experience suggests that $550 a month for food for a family of two is beyond the high end of the acceptable range.

The most difficult expense category to justify is the vitamins. Without documentation of cost or evidence of medical efficacy, this Court finds that the vitamin expense of $450 per month is excessive. Indeed, there is little agreement between

---

16. Case No. 97–11480–13, Proof of Claim No. 1.

17. Debtors' Ex. 7, Interrogatory No. 18.

18. ECMC Ex. O. The USDA's Official Food Plans may be found on the USDA's website at *http://www.cnpp.usda.gov.*

the debtors' interrogatory responses, which state that their medication expense is $780 and their medical and dental visits run $100, and their Schedule J responses, which show medical and dental expense at $350. The variable here seems to be the vitamins.

Because of the lack of evidence concerning Patricia's current income, it is difficult for the Court to construct an "apples to apples" comparison of income and expense. Schedule J shows total expense of $2,959 and Schedule I shows total income of $3,160 for a net available disposable income of $201, $200 of which is paid into the plan. When Patricia's stated current income of $3,132 is reduced by taxes ($663.75) and her KPERS contribution ($138.01), it amounts to $2,330.24. Adding Jerome's stated current social security benefit of $726 (net of Medicare premiums) the total monthly income is $3,056.24. If the interrogatory response expenses are reduced by the $400 withheld from Patricia's salary each month for deposit in the FSA, the debtors' expenses are $3,089, resulting in a negative cash flow. The Court suspects that the debtors may be raiding some of the non-fixed cost categories of their budget to make their plan payments. In any event, it appears that the debtors' budgeting is not as accurate as it could be and that they may well be spending more on food, telephone, home maintenance and vitamins than is reasonably necessary.

### Long Term Persistence of Debtors' Straitened Circumstances

ECMC has agreed to accept payments of $315 per month on the reduced debt of $56,639 once the Chapter 13 plan has been completed in early 2006. ECMC estimates the repayment term post-Chapter 13 would be fourteen and one-half years.

Thus, Patricia would be repaying this debt until the latter half of 2020, at which time she will be 70 years old and presumably no longer employed, but receiving Social Security and KPERS retirement benefits. If payments continue at the current rate, the house will be paid off in 2014, shortly before her retirement. Presumably, debtors will require at least one newer vehicle, justifying the $250 monthly transportation expense continuing. Also, the Court can anticipate that Jerome's social security will increase with the cost of living. While Patricia's income will drop during the loan repayment period, so will her fixed expenses. The great unknowns here, as they are for all of us, are whether her health will sustain her working until retirement and whether her job will remain available. At present, there is no indication she will lose her position given her tenure with the school district.

### Patricia's Efforts to Repay Student Loans

As noted above, the student loans totaled $39,142.33 in advances between 1986 and 1991. As of April 8, 2004, the total balance due was $78,961.67, including interest and costs of collection. Patricia testified that, because of her low salary when she worked for the Catholic Diocese and her husband's disability, these loans were deferred in 1992. In 1997, the debtors filed their first Chapter 13. Indeed, it appears that the only meaningful payments made on these obligations, less than $2,000, have come through the Chapter 13 trustee.[19] Patricia testified that it was her intent to repay her loans with her teaching salary while the family lived on Jerome's income, but this intent was thwarted by his disability which became acute at or about the same time she entered the workforce.

19. Case No. 97–11480–13, Dkt. 22 and 27.

*See also,* Debtors' Ex. 7, Interrogatory No. 14.

Debtors received their previous Chapter 13 discharge on June 17, 2002. They filed this case on October 28, 2002, offering a 36 month plan which was subsequently modified when debtors defaulted post-petition on some IRS obligations. The plan was then extended to 40 months' duration to allow the debtors to repay the post-petition IRS claim of $689.[20] Debtors scheduled some $64,501 in unsecured debt, $56,639 of which is the student loan balance ECMC has agreed to accept. According to the trustee's interim reports, ECMC currently receives about $150 per month in payments.[21]

### Analysis

Upon completion of all plan payments a chapter 13 debtor is granted a discharge of all debts provided for in the plan or disallowed under § 502, except certain debts specified in § 1328(a). Student loans, a debt of the type specified in § 523(a)(8), are expressly excepted from the discharge by § 1328(a)(2). Likewise, Congress has excepted all § 523(a) exceptions from the scope of a chapter 13 hardship discharge under § 1328(b).[22]

Section § 523(a)(8) excepts from discharge educational loans "unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents." Bankruptcy and appellate courts have struggled with both the definition of "undue hardship" and the test to be applied to determine undue hardship.

In February of 2004, the United States Court of Appeals for the Tenth Circuit handed down its opinion in *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*,[23] wherein it adopted the *Brunner*[24] test, with some softening modifications, for determining when sufficient undue hardship exists to justify discharge of a debtor's student loan. In *Polleys*, the Tenth Circuit held that the bankruptcy court must first determine the ability of the debtor to maintain a minimum standard of living while repaying the student loan debt.[25] Second, if the bankruptcy court finds that the debtor is unable to maintain a minimum standard of living while repaying the loan, the bankruptcy court must determine whether this inability is likely to persist for a significant portion of the loan repayment period.[26] This inquiry is limited to the foreseeable future and not past the term of the loan. In contrast with other courts, the Tenth Circuit does not require a debtor to show a "certainty of hopelessness" as a predicate for discharge. Nor must the bankruptcy court find that a permanent medical condition exists. Finally, the bankruptcy court must examine the debtor's good faith effort to repay.[27] The bankruptcy court should consider whether the debtor intentionally created the hardship and whether the debtor consolidated the loans, obtained deferrals, and maximized resources while minimizing living expenses. The Tenth Circuit held that the mere failure to pay, in and of itself, does not establish a lack of good faith.

In discussing the merits of the *Brunner* test versus the "totality of circumstances"

---

**20.** Dkt. 19.

**21.** Dkt. 27.

**22.** *See* 11 U.S.C. § 1328(c)(2).

**23.** 356 F.3d 1302, 1309 (10th Cir.2004).

**24.** *Brunner v. New York State Higher Educ. Services Corp. (In re Brunner)*, 831 F.2d 395 (2d Cir.1987).

**25.** 356 F.3d at 1309–10.

**26.** *Id.* at 1310.

**27.** *Id.*

test adopted by some courts, the Tenth Circuit noted that stringent application of *Brunner* frequently yielded very harsh results. "These applications show that an overly restrictive interpretation of the *Brunner* test fails to further the Bankruptcy Code's goal of providing a 'fresh start' for the honest but unfortunate debtor ...." [28] At the same time, the Court noted that the totality test does not necessarily avoid *Brunner's* harsh outcomes. Instead, the totality approach "has an unfortunate tendency to generate lists of factors that should be considered—lists that grow longer as the case law develops." [29]

The Tenth Circuit held that in applying the first leg of the *Brunner* analysis, whether the debtor can maintain a minimal standard of living while making loan payments, bankruptcy courts must analyze "all relevant factors, including the health of the debtor and any of his dependents and the debtor's education and skill level." [30] In considering the second leg of *Brunner,* whether the debtor's inability to maintain a minimum standard will persist, courts should analyze "all the facts and circumstances that affect the debtor's future financial position." [31] In making these decisions, courts "should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism" and should consider only the foreseeable future, at most the term of the loan.[32] Applying the good faith leg requires courts to determine whether debtor has made a good faith attempt to repay by minimizing expenses and maximizing income. Is the debtor acting in good faith

or is his hardship his own creation? The inquiry should "focus on questions surrounding the legitimacy of the basis for seeking a discharge. * * * Good faith, however, should not be used as a means for courts to impose their own values on a debtor's life choices." [33]

Ultimately, the Tenth Circuit summarized its softening of *Brunner* as follows:

We therefore join the majority of the other circuits in adopting the *Brunner* framework. However, to better advance the Bankruptcy Code's 'fresh start' policy, and to provide judges with the discretion to weigh all the relevant considerations, *the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged.*[34]

The Court now considers the evidence in the present case in light of the modified *Brunner* test adopted in *Polleys.*

### Minimal Standard of Living While Repaying Student Loan

■ In this case, absent some adjustments to their budgeted expenses, debtors do not appear to be able to make the $315 student loan payments that would be required of them post Chapter 13 discharge. As the Court noted above, it is difficult to see how debtors are able to make their $200 plan payment without raiding one or more budget categories. Debtors' budget, as it was presented at trial, does offer some opportunity for adjustment. As previously stated, the Court is skeptical of the efficacy of Jerome's $450 per month vita-

28. *Id.* at 1308.

29. *Id.* at 1309.

30. *Id.*

31. *Id.*

32. *Id.* at 1310, *quoting* Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start*

*Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 Tul. L.Rev. 139, 197 (1996).

33. *Id.* at 1310.

34. *Id.* at 1309 (emphasis added).

min regimen and no medical necessity is shown for it. Moreover, it appears debtors are prepaying their mortgage while not paying ECMC's debt. Finally, their food budget is significantly higher than that allotted for a family of two by the USDA. Patricia is paid a salary well above the poverty line and is a tenured teacher of English whose employment would seem as secure as anyone's. While Jerome is certainly in a precarious state of health, Patricia's job gives him access to extensive health care with a small deductible. Patricia and Jerome are certainly not destitute, although the Court recognizes their current circumstances to be strained. Patricia has a lead time of several months in which to reassess her budget so that, when she obtains a chapter 13 discharge in 2006, she will be in a position to make the $315 student loan payments.[35] With appropriate adjustment of their monthly living expenses, the Court cannot find that Patricia is "unable to earn sufficient income to maintain [her]self and [her] dependents and to repay the educational debt."[36]

### Long Term Persistence

■ In addressing the likelihood that debtors' financial strain will persist during the repayment term of the student loan debt, this Court has considered carefully where the debtors will be financially at the time of Patricia's retirement.[37] While the Court is concerned that Patricia will be liable for these loan payments well past her retirement age, it appears that her home will be paid for before she retires, reducing her monthly cash flow burden by

nearly $800. While she will no longer receive a teaching salary, she will receive social security and a teacher's pension. She and Jerome will both be covered by Medicare. Outside of uninsured medical expenses, the student loan payments may be her only monthly obligation. In short, the debtors should enjoy an improved standard of living from their current situation for the majority of the repayment term. They will complete their plan payments in early 2006, freeing up an additional $200 a month during the repayment term.

Finally, the fact that this obligation will persist into Patricia's late age is the result of her choosing to return to school on borrowed money at the age of 36. The fact that this Court should not "impose its own values on a debtor's life choices" should not completely insulate Patricia from the consequences of her choice to attend school later in life in hopes of taking up a profession. Indeed, had Patricia not had the financial ability to attend Friends and obtain her teaching degree, she and Jerome might be in far more desperate straits than they are now. That student loan payment periods may progress beyond a borrower's retirement age, standing alone, should not skew the second *Brunner* test against lenders.

### Good Faith

■ As to the debtors' good faith, this Court finds that the debtors are trying. At the same time, the debtors can do more to minimize their current household living

---

**35.** Upon receiving their discharge, debtors' former $200 plan payment will be available to apply toward the student loan debt. The Court concludes that debtors can readily find an additional $115 from their overstated monthly expenses.

**36.** *Id.* at 1310, *quoting* Commission Report, 4–710.

**37.** As noted previously, the estimated repayment term post-Chapter 13 is fourteen and one-half years, or until the latter half of 2020, at which time Patricia will be 70 years old and presumably retired.

expenses.[38] As the record indicates, they have raised and educated six children and supported an aging mother. Despite physical discomfort, Patricia continues to teach and may be expected to do so for the foreseeable future. Yet, the debtors' shortage of disposable income can be attributed as much to their budgeting woes as to hardship.[39] As noted above, groceries, vitamin expense, long distance telephone costs, low withholding allowances, and prepayment of the home mortgage all contribute to a cash flow shortage. During the plan period, debtors will be paying $200 per month and apparently have done so to date. The Court believes they can find another $115 per month after discharge by minimizing to some degree their grocery, long distance, and vitamin expense while increasing Patricia's withholding allowances to reflect Jerome as a dependent.

Moreover, both debtors have had a great deal of time in which to address this debt. Their pre-bankruptcy deferment of the student loan obligations while Patricia taught in the parochial school system was certainly justified, as was the consolidation. Yet, they have put off payment of this obligation another six and a half years in two bankruptcy cases in which ECMC's claim appears to have been the largest unsecured claim.

In short, the Court concludes that debtors can do more to "actively minimiz[e] current household living expenses." [40]

## Conclusion

 Bearing in mind that the debtors have the burden of proving undue hardship,[41] the Court finds that debtors have not demonstrated an undue hardship under the modified *Brunner* test set forth in *Polleys*. With some adjustment to their monthly living expenses, debtors can maintain a minimal standard of living while repaying the student loan obligation. This standard of living will likely improve in 2006, when debtors complete their chapter 13 plan payments and obtain their discharge, and in later years, when debtors retire their home mortgage. The Court concludes that when viewed with all the other circumstances, debtors simply have not shown that repayment of the student loan debt will present the undue hardship requisite for discharge.

Judgment should be entered for ECMC and against Patricia Mandala on her complaint, finding that ECMC's student loan debts are excepted from discharge under § 523(a)(8) and § 1328(a)(2) to the extent of $56,639, less whatever amounts are applied to the principal balance of the debt from payments through the Chapter 13 plan. A Judgment on Decision will be entered this day.

---

38. *Id.* at 1312 (Good faith can be satisfied by a showing that debtor is actively minimizing current household living expenses and maximizing personal and professional resources.).

39. Some of debtors' hardship can be attributed to Jerome's disability, an event beyond their control and not intentionally created. *Id.* at 1309, 1311.

40. *Cf. Polleys*, supra at 1312 where the court found that debtor "could do little more to minimize her current household living expenses" and her failure to maximize her personal and professional resources was due to circumstances "beyond her control."

41. *See Woodcock v. Chemical Bank, NYSH-ESC (In re Woodcock)*, 45 F.3d 363, 367 (10th Cir.1995), *cert. denied*, 516 U.S. 828, 116 S.Ct. 97, 133 L.Ed.2d 52 (1995); *In re Innes*, 284 B.R. 496, 502 (D.Kan.2002).