**In re Robert ALDERETE and Linda D. Alderete, Debtors.**

**Robert Alderete and Linda D. Alderete, Plaintiffs—Appellees,**

**v.**

**Educational Credit Management Corporation, Defendant— Appellant,**

**U.S. Department of Education and Colorado Student Loan Program for State of Colorado, Defendants—Appellees.**

**OSI Collection Services; Education Loan Service Center; State of Colorado; and Whindam Professionals, Defendants.**

**BAP No. NM–02–089.
Bankruptcy No. 7–98–16943 MA.
Adversary No. 00–01029.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

April 16, 2004.

498

Troy Gunderman, St. Paul, Minnesota (Karla K. Poe and Edward Ricco of Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico, with him on the brief), for Defendant—Appellant Educational Credit Management Corporation.

George M. Moore of George M. Moore & Associates, Albuquerque, New Mexico, for Plaintiffs—Appellees Robert Alderete and Linda D. Alderete.

Before CLARK, MICHAEL, and BROWN, Bankruptcy Judges.

## OPINION

CLARK, Bankruptcy Judge.

The Educational Credit Management Corporation (ECMC) timely appeals a final Judgment of the United States Bankruptcy Court for the District of New Mexico,[1] discharging a debt for interest and attorneys' fees related to the student loans of the Chapter 7 debtors (Debtors) pursuant to 11 U.S.C. § 523(a)(8).[2]  The parties

1. 28 U.S.C. § 158(a)(1); Fed. R. Bankr.P. 8002(a).

2. ECMC also appeals the bankruptcy court's earlier interlocutory "Order Denying Motion for Summary Judgment (ECMC)," which de-

nied summary judgment on the basis that there existed genuine issues of material fact. Such an Order, however, is not appealable. *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1251 (10th Cir.1992).  Furthermore, we note that to the extent that ECMC contests the Order

have consented to this Court's jurisdiction because they have not elected to have this appeal heard by the United States District Court for the District of New Mexico.[3] For the reasons stated herein, we AFFIRM the Judgment in favor of the Debtors, discharging a portion of their student loan debt.

### I. *Background*

The bankruptcy court's findings of fact, as set forth in the Memorandum Opinion that accompanied its Judgment, are not disputed on appeal.[4] Accordingly, the bankruptcy court's findings of fact are adopted by this Court, and they are summarized as follows.

The Debtors, Robert and Linda Alderete, met while they were attending the Colorado Institute of Art (CIA), and married before they received their degrees. To pay for their education, the Debtors each obtained several student loans (collectively, the "Student Loans"). Robert obtained a total of six loans, the original principal amount of which totaled approximately $13,000. Robert's Student Loans are evidenced by six promissory notes, three of which are held by ECMC, and three of which are held by the United States Department of Education (USDE). Linda obtained four loans, the original principal amount of which totaled approximately $18,300.00. Linda's Student Loans are evidenced by four promissory notes, three of which are held by ECMC, and one of which is held by the Colorado Student Loan Program (CSLP).

In 1990, Robert received an associates' degree in visual communication from CIA.

Linda received the same degree from CIA in 1991.

Sometime after graduating from CIA, the Debtors moved to New Mexico, and they live in Albuquerque. The couple has three children who are at least 8, 11 and 12 years of age, and all of whom are in good health.

Neither Debtor works in the field for which their CIA degree trained them, and the skills Robert obtained from his schooling are outdated. The same likely applies to Linda, although no direct findings were made on this point.

Robert has worked as a landscape maintenance man for at least twelve years. He is currently a foreman and earns an hourly wage of $8.50. He has not looked for other jobs, and he does not expect to earn more than his current wage, except to the extent that his wages are adjusted for cost of living increases.

Linda has worked for the Albuquerque Public Schools (APS) as a part-time educational assistant in a kindergarten class for at least five years. Linda's annual salary was not stated by the bankruptcy court, but the court found that increases to her annual pay are tied to APS' budget. In 2002, Linda did not receive a pay increase. Linda is not qualified for more advanced positions in APS without obtaining additional schooling. Furthermore, to keep her current position, she will either need to take certain college-level courses, which the bankruptcy court concluded she could not afford, or to take and pass an

---

on grounds other than the legal issues raised in conjunction with the Judgment, it has waived such arguments because they are not argued in its appellate brief. *See, e.g., State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994).

**3.** 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001(e).

**4.** *Alderete v. Colorado Student Loan Program (In re Alderete),* 289 B.R. 410 (Bankr.D.N.M. 2002).

examination. There was no finding as to whether the latter option was feasible.

The Debtors filed their Chapter 7 petition in 1998. Prior to their petition date, the Debtors made payments on their Student Loans "whenever they were able to do so."[5] Linda paid between $184.00 and $194.00 to ECMC on one of her Student Loans before they were in default.[6] After default, Robert paid approximately $1,900.00 on the ECMC Student Loans, and Linda paid ECMC approximately $1,300.00. Both of the Debtors obtained several deferments and forbearances from ECMC. The bankruptcy court made no findings as to whether the Debtors had made any prepetition payments to USDE or CSLP, or whether those entities had granted the Debtors deferments on their Student Loans.

The bankruptcy court stated that the Schedules filed by the Debtors in their Chapter 7 case show that in the year 2000 they had net monthly income of $1,799.00. They do not own a house or real property, and they own one car, a 1991 Jeep Cherokee, with approximately 200,000 miles. The Debtors' entire family is covered by medical insurance, but only the Debtors, not the children, are covered by dental insurance.

According to the bankruptcy court, the Debtors' Schedules also disclose that their monthly expenses for the year 2000 were $1,797.00. The bankruptcy court did not find these expenses to be misstated. In the case of medical and dental expenses the court insinuated that the stated budget was low inasmuch as it found that the monthly budget for such expenses was $10.00, but the Debtors' medical plan required a $15.00 co-pay for a visit to the doctor's office. Furthermore, as noted above, the Debtors' children are not covered by dental insurance. Although the Debtors budgeted $160.00 a month in "charitable contributions," the evidence showed that that money was actually used to pay unexpected expenses or to cover other under-budgeted monthly expenses, such as $360.00 for food for a family of five.

Other than relatively nominal medical bills, the Student Loans are the Debtors' only unsecured debt. The Debtors stated that their total unsecured debt was in the amount of $44,072.00, and the bankruptcy court found that 98% of that amount was the debt for the Student Loans. In particular, the bankruptcy court found that the total capitalized principal amount of the Student Loans was $44,486.13. When interest and collection costs were added to the principal debt, the court found that the Debtors' total indebtedness for the Student Loans was nearly $78,000.

In 2000, approximately one year after receiving their discharge, the Debtors commenced an adversary proceeding against ECMC, USDE and CSLP, alleging that repayment of the Student Loans would be "impose an undue hardship" on them and their dependants within the meaning of § 523(a)(8). Thus, they sought to discharge the entire debt. The bankruptcy court held a trial on the Debtors' complaint. CSLP did not appear at the trial.

At the time of trial, Robert was 37 years old, and Linda was 32 years old. Neither had any significant medical problems.

The bankruptcy court admitted evidence at trial related to the William D. Ford Loan Consolidation Program (Ford Program), which it stated allows student loans

---

**5.** *Alderete,* 289 B.R. at 419.

**6.** *See id.* at 414 & 419 (stating $184.00 and $194.00 as the amounts paid).

to be consolidated and payments on the consolidated loan to be adjusted based on a formula that takes into account a debtor's adjusted gross income and poverty guidelines. Furthermore, according to the evidence received, under the Ford Program, debtors can defer payments on the consolidated loan, and after twenty-five years, the debt remaining on the consolidated loan is forgiven. The Debtors testified that they had considered consolidating their Student Loans under the Ford Program, but they did not do so because they had insufficient information and they did not want to sign another promissory note. Although there was no evidence as to whether the Debtors would have qualified for the Ford Program, the bankruptcy court concluded that if they did, their monthly payment on a consolidated loan would be $70.00. The bankruptcy court stated, however, that this $70.00 payment did not include one of the Student Loans—Linda's debt to CSLP. According to the bankruptcy court, Linda owed CSLP $3,654.89 in principal, interest of $3,654.89, and collection costs of $1,045.49.

After the trial, the bankruptcy court took the matter under advisement, and later entered its Memorandum Opinion and Judgment in favor of the Debtors in part, and in favor of the holders of the Student Loans in part. It concluded that the Debtors had "failed to meet their burden of proving that repayment of the student loans [would] cause an undue hardship sufficient to discharge the loans in their entirety."[7] But, based on the Debtors' "current and anticipated future financial condition," the bankruptcy court determined that the Debtors would "not be able to pay off their student loans in full if interest and attorneys' fees continue to accrue."[8] Accordingly, the bankruptcy court held "the principal amount of [the Debtors'] student loans [were] not dischargeable, but that the interest and attorneys' fees [were] dischargeable."[9]

ECMC timely appealed to this Court the bankruptcy court's final Judgment in favor of the Debtors discharging the portion of the Student Loans attributable to interest and attorneys' fees. The Debtors did not appeal the portion of the Judgment in favor of the lenders refusing to discharge the portion of the Student Loans attributable to principal.

## II. *Discussion*

Section 523(a)(8) states that a Chapter 7 discharge does not discharge an individual debtor from any debt "for an educational ... loan made, insured or guaranteed by a governmental unit ... unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependants[.]"[10] The parties stipulated below that the Student Loans were within the scope of § 523(a)(8) and, therefore, the only issue before the bankruptcy court was whether the Student Loans should be discharged as imposing an "undue hardship" on the Debtors and their dependents. The bankruptcy court concluded that undue hardship had not been established as to the principal portion of the Student Loans, but that repayment of accrued interest and attorneys' fees would impose an undue hardship. Thus, it refused to discharge the portion of the debt attributable to principal, and it discharged the portion attributable to interest and fees.

---

7. *Id.* at 413.

8. *Id.*

9. *Id.*

10. 11 U.S.C. § 523(a)(8).

As recognized by the bankruptcy court, the phrase "undue hardship" is not defined by the Bankruptcy Code and, until recently, its definition was open for debate in the Tenth Circuit inasmuch as neither the Supreme Court nor our Court of Appeals had spoken on the issue. Since the bankruptcy court issued its Judgment partially discharging the Student Loans, however, the Court of Appeals for the Tenth Circuit has filed *Educational Credit Management Corp. v. Polleys (In re Polleys),*[11] which, as discussed in more detail below, defines the phrase "undue hardship." Accordingly, we are compelled to review the bankruptcy court's Judgment partially discharging the Student Loans in light of *Polleys.*

Applying *Polleys* to the bankruptcy court's findings of fact, we conclude that the bankruptcy court erred in partially discharging the Student Loans because it should have discharged the entire debt as imposing an "undue hardship" on the Debtors and their dependants. Typically, such a conclusion would result in our reversal of the portion of the Judgment refusing to discharge the principal debt, and our affirmance of the portion of the Judgment discharging the interest and attorneys' fees. We cannot reverse the portion of the bankruptcy court's Judgment refusing to discharge the principal debt, however, because we lack jurisdiction to do so. That portion of the Judgment was adverse to the Debtors, they have not appealed the

Judgment, and their time to do so has now expired.[12] Accordingly, we only have jurisdiction to affirm the portion of the Judgment discharging the interest and attorneys' fees that was timely appealed by ECMC. Because, for the reasons stated below, we conclude that the entire student loan debt should have been discharged, we will not consider ECMC's argument that the bankruptcy court erred in entering a partial discharge of the Student Loans.

In *Polleys,* the Tenth Circuit affirmed a judgment discharging a Chapter 7 debtor's student loans as an "undue hardship" under § 523(a)(8). Significantly, in so doing, it states:

While this court is obliged to accept the bankruptcy court's undisturbed findings of fact unless they are clearly erroneous, we review de novo conclusions as to the legal effect of those findings. *United States v. Richman (In re Talbot),* 124 F.3d 1201, 1206 (10th Cir.1997). Whether a debtor's student loans would impose an "undue hardship" under 11 U.S.C. § 523(a)(8) is a question of law. *Woodcock v. Chemical Bank, NYSHESC (In re Woodcock),* 45 F.3d 363, 367 (10th Cir.1995). It requires a conclusion regarding the legal effect of the bankruptcy court's findings as to the debtor's circumstances, and is therefore reviewed de novo. *Id.; see also Long v. Educ. Credit Mgmt. Corp. (In re Long),* 322

---

11. 356 F.3d 1302 (10th Cir.2004).

12. *See* Fed. R. Bankr.P. 8001(a) & 8002(a); *Dimeff v. Good (In re Good),* 281 B.R. 689, 695–98 (10th Cir. BAP 2002) (appellate court lacks jurisdiction over orders where no notice of appeal filed); *Aspect Tech. v. Simpson (In re Simpson),* 215 B.R. 885, 886 (10th Cir. BAP 1998) (absent timely notice of appeal, appellate court lacks jurisdiction over cross appeal); *see generally Smith v. Barry,* 502 U.S. 244, 245, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992) (jurisdiction of appellate court contin-

gent on the filing of a timely notice of appeal); *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 315, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) (same). ECMC lacked standing to appeal the Judgment in its favor and, therefore, its timely-filed notice of appeal did not appeal the Judgment in favor of it discharging the principal portion of the Student Loans. *See, e.g., O'Brien v. State of Vermont,* 184 F.3d 140, 141–42 (2d Cir.1999) (per curiam) (party who succeeds at trial is not a person aggrieved with standing to appeal).

F.3d 549, 553 (8th Cir.2003) (collecting cases).[13]

As part of its de novo review of the existence of "undue hardship" in *Polleys*, the Tenth Circuit definitively defines the phrase. It considered numerous Courts of Appeals decisions and the history of § 523(a)(8) prior to adopting the test for "undue hardship" set forth in *Brunner v. New York State Higher Education Services Corp.*[14] Under *Brunner*, "undue hardship" exists if the debtor proves by a preponderance of the evidence all of the following:[15]

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependants if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.[16]

In adopting this test, however, the Tenth Circuit makes clear that it disdains "overly restrictive" interpretations of the test, and concludes that it should be applied to "further the Bankruptcy Code's goal of providing a 'fresh start' to the honest but unfortunate debtor[.]"[17] It states as follows:

> We therefore join the majority of the other circuits in adopting the *Brunner*

framework. However, to better advance the Bankruptcy Code's "fresh start" policy, and to provide judges with the discretion to weigh all the relevant considerations, *the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged.*[18]

In *Polleys*, therefore, the Tenth Circuit established that *Brunner* must be used as the basis for analyzing whether or not "undue hardship" exists, but it then went on to provide its own interpretation of each of the three prongs of the *Brunner* test in light of its view that student loans that truly cannot be repaid should be discharged. Its interpretation of the each of the three prongs is discussed below.

■ In evaluating the first prong of *Brunner*—that the debtor cannot maintain a minimum standard of living while repaying the student loan debt—the Tenth Circuit states that bankruptcy courts should evaluate the debtor's current financial situation. They should take into consideration whether the debtor has demonstrated any reason why he or she is unable to earn sufficient income to maintain him/herself and dependants while repaying the student loan debt.[19]

■ As to the second prong of the *Brunner* test, the Tenth Circuit states:

> The second *Brunner* element, which requires that additional circumstances

---

**13.** *Polleys*, 356 F.3d at 1305–06.

**14.** 831 F.2d 395, 396 (2d Cir.1987) (per curiam).

**15.** *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance of the evidence standard applies under § 523(a)); *Andersen v. UNIPAC–NEBHELP (In re Andersen)*, 179 F.3d 1253, 1256 (10th Cir.1999) (debtor bears the burden under § 523(a)); *Woodcock v. Chemical Bank, NYSHESC (In re Woodcock)*, 45 F.3d 363, 367 (10th Cir.1995) (same).

**16.** *Brunner*, 831 F.2d at 396, *quoted in Polleys*, 356 F.3d at 1307.

**17.** *Polleys*, 356 F.3d at 1308 (quoting *Stellwagen v. Clum*, 245 U.S. 605, 617, 38 S.Ct. 215, 62 L.Ed. 507 (1918)); *see id.* at 1308–09 (giving examples of overly restrictive application of the *Brunner* three-part test).

**18.** *Id.* at 1309 (emphasis added).

**19.** *Id.* at 1309–10.

exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans, properly recognizes that a student loan is "viewed as a mortgage on the debtor's future." *However, in applying this prong, courts need not require a "certainty of hopelessness." Instead, a realistic look must be made into [a] debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like. Importantly, "courts should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism,"* and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan.[20]

The court states in *Polleys* that under this prong of the *Brunner* test, "additional circumstances" does not require some horrific event or condition.[21] Thus, "a permanent medical disability is [not a] prerequisite to discharging a student loan debt" under the second *Brunner* prong.[22] But, it also notes that "'the discharge of a student loan should be based upon an inability to earn and not simply a reduced standard of living.'"[23]

The third prong of the *Brunner* test states that trial courts should consider whether the debtor has made a "good faith effort to repay" a student loan.[24] While a debtor's attempt to work out a repayment plan with the holder of a student loan, such as by entering into deferral programs or consolidating loans, may contribute to a finding of good faith,[25] the Tenth Circuit looks at this "good faith" element more broadly than whether there has been an effort to repay. In fact, the court in *Polleys* expressly states that "the failure to make a payment [to the holder of the student loan], standing alone, does not establish lack of good faith[,]" and even if a debtor has made no payments on a loan, good faith may exist.[26] The Tenth Circuit defines good faith as follows: "[W]e think that the good faith portion of the *Brunner* test should consider *whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship.*"[27] Thus,

> an inquiry into a debtor's good faith should focus on questions surrounding the legitimacy of the basis for seeking a discharge. For instance, a debtor who willfully contrives a hardship in order to discharge student loans should be deemed to be acting in bad faith. Good faith, however, should not be used as a means for courts to impose their own values on a debtor's life choices.[28]

Good faith will exist under *Polleys* when a debtor's unfortunate financial or personal circumstances are the result of factors be-

---

**20.** *Id.* at 1310 (citation omitted) (emphasis added) (quoting Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 Tul. L.Rev. 139, 197 (1996)); *rejecting Brightful v. Pennsylvania Higher Education Assistance Agency (In re Brightful),* 267 F.3d 324, 328 (3rd Cir.2001) (applying a "certainty of hopelessness" standard in interpreting the second prong of the *Brunner* test).

**21.** *Id.* at 1311.

**22.** *Id.*

**23.** *Id.* at 1306 (quoting *Cuenca v. Department of Education,* No. 94–2277, 1995 WL 499511, at *2 (10th Cir. Aug.23, 1995)).

**24.** *Brunner,* 831 F.2d at 396.

**25.** *Polleys,* 356 F.3d at 1312.

**26.** *Id.* at 1311.

**27.** *Id.* at 1309 (emphasis added).

**28.** *Id.* at 1310.

yond his or her reasonable control.[29] Additionally, because § 523(a)(8) "was designed to remove the temptation of recent graduates to use the bankruptcy system as a low-cost method of unencumbering future earnings[,]"[30] the Tenth Circuit makes the point that a good faith analysis should take into account the amount of time that has lapsed between the debtor obtaining his or her degree and the bankruptcy filing. A discharge sought shortly after a degree is earned—

> controvene[s] the general policy that "a loan ... that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependants and to repay the educational debt."[31]

Finally, the Tenth Circuit states that good faith "can be satisfied by a showing that [the debtor] is actively minimizing current household living expenses and maximizing personal and professional resources."[32]

█ Applying *Polleys*, we start with the premise that we must accept the bankruptcy court's undisputed findings of fact, and review de novo its conclusions as to the legal effect of those findings—whether "undue hardship" exists.[33] Based on the bankruptcy court's findings of fact as summarized above and the test for undue hardship set forth in *Polleys*, we conclude that the bankruptcy court's application of the *Brunner* test was not in accord with

*Polleys* and, as a result, it erred in refusing to discharge the Debtors' entire Student Loan debt. While it discharged the portion of the debt attributable to interest and attorneys' fees, it also should have discharged the principal debt.

The bankruptcy court concluded, and it is not contested, that the Debtors proved under the first prong of *Brunner* that they could not maintain, based on current income and expenses, a minimal standard of living for themselves and their dependants if they were forced to repay the Student Loans.[34] It stated that although the Debtors "live frugally, they are barely able to make ends meet."[35] Indeed, the Debtors' undisputed monthly income exceeds their undisputed monthly expenses by only $2.00. We do not disagree with this application of the facts to the law.

As to the second prong of *Brunner*, the bankruptcy court held that, with respect to the principal debt, the Debtors failed to meet their burden because they failed to demonstrate "unique or exceptional circumstances," their family budget would decrease as their three children reached the age of majority, their current circumstances did not limit their ability to earn better pay in the future, and the Debtors had not made an effort to search for better employment.[36] In so holding, the bankruptcy court stated that student loan debts should only be discharged in "rare circumstances."[37]

---

29. *Id.* at 1311–12.

30. *Id.* at 1306.

31. *Id.* (quoting Report of the Comm'n on the Bankr.Laws of the United States, H.R. Doc. No. 93–137, Pt. II § 4–506 (1973), *reprinted in Collier on Bankruptcy,* App. Pt. 4(c), at 4–710 (Lawrence P. King ed., 15th ed. rev.2003)).

32. *Id.* at 1312.

33. *Id.* at 1305.

34. *Alderete,* 289 B.R. at 417.

35. *Id.*

36. *Id.* at 417–18.

37. *Id.* at 417.

This interpretation of the second prong of the *Brunner* test, however, is not in accord with the Tenth Circuit's interpretation of it in *Polleys*. The Tenth Circuit does not require a showing of "unique or exceptional circumstances." More fundamentally, the Tenth Circuit does not require that rare circumstances exist to discharge a student loan. To the contrary, it states in *Polleys* that the *Brunner* test "must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged."[38] Of course, as noted by the Tenth Circuit, merely showing a reduced standard of living will not suffice to discharge a student loan debt. But, when there is proof that a debtor is unable to earn sufficient income currently and in the future to repay the student loan while maintaining a minimal standard of living, *Polleys* instructs that the debt must be discharged.

When a "realistic look" is made into the Debtors' circumstances and their "ability to provide for adequate shelter, nutrition, health care, and the like"[39] for themselves and their children, the undisputed facts establish that the second prong of the Brunner test was met. The Debtors currently live frugally, their monthly income exceeds monthly expenses by $2.00, they have no dental insurance for a young child and teenagers, and at the time of trial, their one car was over ten years old and had approximately 200,000 miles. Their current budget undisputably leaves them no money to repay the Student Loans.

Although the Debtors are relatively young and have no significant health problems, the record shows that their prospective financial situation makes them unable to earn the sums necessary to repay the Student Loans. The skills that Robert obtained at CIA over a decade ago are outdated, and the same probably applies to Linda's skills. Linda's job status is not certain inasmuch as she will have to obtain additional training or pass certain tests to keep her current job. The bankruptcy court found that obtaining additional training was not feasible. Neither Debtor anticipated any notable increase in wages. No findings were made that the Debtors are qualified to perform higher paying jobs. But, it is apparent that this is not a case where the Debtors are trained in a more lucrative career, and they choose to work for less money, such as a doctor or lawyer working in the public service sector. Perhaps Linda could work full-time to earn additional income or Robert could take on more work, or both, but there was no finding of fact as to whether such employment was obtainable or feasible. Additionally, *Polleys* expressly states that courts should not impose "their own values on a debtor's life choices."[40] Finally, at the time of trial, the Debtors' youngest child was eight years old. The burden on the family budget to support a child, therefore, will not disappear for at least ten years.

When we evaluate the bankruptcy court's findings of fact over the "foreseeable future" and in the tenor of *Polleys*, we conclude that the bankruptcy court erred in concluding that the Debtors failed to meet their burden in establishing the second prong of the *Brunner* test as to the principal debt. Like the portion of the debt attributable to interest and fees, that was discharged, the principal will never be "realistically repaid"[41] and, therefore it too should have been discharged.

---

38. *Polleys*, 356 F.3d at 1309.

39. *Id.* at 1310.

40. *Id.*

41. *Alderete*, 289 B.R. at 418 (quoting *Coats v. New Jersey Higher Education Assistance Authority (In re Coats)*, 214 B.R. 397, 403 (Bankr.N.D.Okla.1997)).

■ Finally, the bankruptcy court held that the Debtors failed to show good faith under the third prong of the *Brunner* test. According to the bankruptcy court, the Debtors' failure to inquire into the Ford Program coupled with the fact that the Student Loans represented virtually all of their unsecured debt indicated a lack of good faith to repay the Student Loans. Based on the record in this case, we conclude that the bankruptcy court erred in placing so much weight on the Ford Program given the fact that there was *no* evidence that the Debtors were eligible thereunder. Furthermore, and more importantly, although the good faith analysis may inquire into a debtor's cooperation with lenders and attempts to repay a student loan, the Debtors' failure to investigate the Ford Program was given too much weight in this case where the evidence showed that even if eligible, the Debtors could not have made their Ford Program payments. The bankruptcy court found that, exclusive of Linda's debt to CSLP, the Debtors would be required to pay at least $70.00 a month under the Ford Program. Yet, the facts show that the Debtors are currently unable to pay $70.00 a month, and as discussed above, it does not appear that their financial situation will allow them to make such payments in the future. Thus, we conclude that the Ford Program should not have been given the weight afforded to it by the bankruptcy court in this case.

*Polleys* instructs that third prong of the *Brunner* test is based on whether the Debtors are "acting in good faith in seeking the discharge, or whether [they are] intentionally creating .:. hardship." [42] This standard, of course, is fact intensive, but based on *Polleys* and the facts as found by the bankruptcy court, we conclude that the Debtors met their burden of establishing that they were seeking a discharge in good faith. The Debtors attempted to repay their Student Loans prepetition by making payments whenever they were able to do so, and they cooperated with the lenders by seeking deferrals of the Student Loans. The Debtors live frugally, and the findings of fact show that they actively minimize their living expenses. There was no evidence that the Debtors were attempting to abuse the student loan system by having their Student Loans "forgiven before embarking on lucrative careers …." [43] Indeed, the Debtors attempted to repay the Student Loans for a period of seven and eight years after they obtained their respective degrees. The skills that Robert obtained from his CIA degree are outdated and will not add to his future earning potential. Given the fact that Linda's CIA degree in the same area was conferred only one year later, the same is also probably true for her. The bottom line is that the Debtors are not attempting to maintain a certain standard of living. They simply do not have the current or future ability to earn the sums necessary to repay the Student Loans. All of these facts show that the bankruptcy court erred in concluding that the third prong of the *Brunner* test had not been met.

■ We note that although the Student Loans comprise virtually all of the Debtors' unsecured debt, this fact, standing alone, will not vitiate a conclusion of good faith, especially when there was no evidence of bad faith and there are so many facts showing that the Debtors are seeking a discharge in good faith. As correctly stated by the bankruptcy court,

---

42. *Polleys,* 356 F.3d at 1309.

43. *Id.* at 1312 (quoting *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 360 (6th Cir.1994)).

" 'the fact that a debtor seeks to discharge almost exclusively student loan obligations ... should be afforded little weight.' This is true because the primary purpose of every bankruptcy is to discharge debts." [44] In § 523(a)(8), Congress has expressly authorized the discharge of student loan debt whose repayment imposes an undue hardship. The Debtors should not be penalized for filing a Chapter 7 petition to afford themselves of that provision.

■ Accordingly, based on *Polleys,* the bankruptcy court should have discharged the Student Loans in their entirety as an undue hardship within the meaning of § 523(a)(8). Because we lack jurisdiction over the Judgment in favor of ECMC refusing to discharge the principal portion of the debt, we must simply affirm the Judgment in favor of the Debtors discharging portion of the debt attributable to interest and attorneys' fees. We will not determine whether or not the bankruptcy court erred in selecting a portion of the Debtors' Student Loans for discharge in light of our conclusion that the entire debt should have been discharged.

### III. *Conclusion*

The bankruptcy court's Judgment is AFFIRMED.

---

**44.** *Alderete,* 289 B.R. at 419 (quoting *Hollister v. Univ. of N.D. (In re Hollister),* 247 B.R. 485, 491–92 (Bankr.W.D.Okla.2000)).