In re Kristian AZWAR, Debtor.

Kristian Azwar, Plaintiff—Appellee,

v.

Texas Guaranteed Student Loan Corporation, a non-profit Texas corporation, and Oklahoma State Regents for Higher Education, Defendants—Appellants.

BAP Nos. WO–05–005, WO–05–006.
Bankruptcy No. 04–13501–BH.
Adversary No. 04–01150–BH.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

June 27, 2005.

Mac D. Finlayson of Morrel, West, Saffa, Craige & Hicks, Inc., Tulsa, Oklahoma, for Defendant—Appellant Texas Guaranteed Student Loan Corporation.

David B. Harting, Oklahoma City, Oklahoma, for Defendant—Appellant Oklahoma State Regents for Higher Education.

Before CLARK, NUGENT, Chief Judges, and McNIFF, Bankruptcy Judge.

## OPINION

NUGENT, Bankruptcy Judge.

The Oklahoma State Regents for Higher Education (Regents) and the Texas Guaranteed Student Loan Corporation (TGSLC) (collectively, the "Creditors") timely appeal a final Judgment of the United States Bankruptcy Court for the Western District of Oklahoma discharging the Chapter 7 debtor's student loan debt pursuant to the "undue hardship" provision in 11 U.S.C. § 523(a)(8).[1] The parties have consented to this Court's jurisdiction because they have not elected to have this appeal heard by the United States District Court for the Western District of Oklahoma.[2] We REVERSE.

### I. *Background*

Kristian Azwar, the debtor ("Azwar" or "debtor"), obtained student loans from the Creditors in 1998 and 1999, to assist him in procuring a Master's Degree in Management Information Systems from Oklahoma City University. After he earned his Degree in 2001, the debtor made no payments on the student loan debt.[3] Rather, he requested that the Creditors forebear collection of the debt because he was unable to make monthly payments to them. The Creditors allow borrowers to defer loan payments for twelve-month periods up to five years, and based on that policy, they placed the debtor's student loan debt in "forbearance status." As a result, although the debtor made no payments, his student loan debt has never been in default.

On April 1, 2004, approximately three years after he obtained his Master's Degree, the debtor filed his Chapter 7 petition. He commenced an adversary proceeding against the Creditors in May 2004, seeking to discharge his student loan debt. The debtor alleged that excepting the debt from discharge would impose an "undue hardship" on him and his dependents within the meaning of § 523(a)(8) because he did not have the current income to pay the debt and he had "no expectation that [his] income would increase during the next 3 years to allow repayment of the student loan."[4] The bankruptcy court conducted a trial on the Complaint, and the following is a summary of the evidence.

At the time of trial, the debtor was 34 years old, and his nondebtor spouse was 30 years old. The couple has four children between the ages of 1 and 9. No member of the family has health problems or disabilities.

The debtor is employed full-time by Hertz Corporation (Hertz). His spouse does not work outside of the home. Hertz pays the debtor an annual salary of approximately $39,000, and his monthly net pay is $2,767. He receives a 2% raise each year. The couple owns a house, and at least one 1998 vehicle in need of repair. They have no savings accounts.

The debtor's family's largest monthly expense is food. This expense, together with other living expenses, including a mortgage payment, total $2,746. Accordingly, when the family's living expenses are subtracted from the debtor's net pay, the family has a monthly surplus of $21.

1. 28 U.S.C. § 158(a)(1); Fed. R. Bankr.P. 8002(a).

2. 28 U.S.C. § 158(b)-(c); Fed. R. Bankr.P. 8001(e).

3. The record shows that a payment of less than $25 was made to TGSLC on the debtor's account. But, the debtor did not recall making any payments.

4. Complaint at ¶ 5, in Appellants' Joint Appendix ("App.") at 7.

The debtor has worked for Hertz for six years, and he has worked in his current information systems "group" as an assistant systems analyst for the past two years.[5] He hopes to become a manager of his group. The debtor stated: "to make a substantial amount of money [in his group at Hertz], it usually takes about five years."[6] He then qualified that statement, indicating that "substantial" was not really a lot of money (but he did not say what this sum would be), and that he would probably not be considered for promotion for at least four more years. The debtor stated generally that he did not know of other jobs where he would increase his pay by a substantial amount. When asked if he had looked for other employment in his field, the debtor said, "I don't feel like going out of Hertz to find a job."[7]

The debtor worked in Dallas, Texas during his six-year tenure with Hertz. His salary in Dallas was higher than in Oklahoma City. The debtor stated that if he moved back to Dallas he would be paid more, but he did not want to move.

The debtor's spouse earned an accounting degree from the University of Central Oklahoma in 2001. She has no student loan debt. She is not currently employed, nor has she recently sought employment because "she wants to focus on [the] children."[8] She home-schools the debtor's children and, per his testimony, the family intends to home-school them for their entire education.

No one event, such as a job loss or catastrophic health problem, precipitated the filing of the debtor's Chapter 7 case. When the debtor filed his Chapter 7 petition he had significant credit card debt resulting from his family's inability to live on his income.

At the time of trial, the debtor owed the Creditors between $46,000 and $50,000. His debt to TGSLC had been in forbearance status for just under 24 months, and the Regents' debt had been in forbearance status for 25 months. If the debtor were to commence repaying his student loan debt, he would be required to make two payments, one to TGSLC and one to Regents. Under the terms of the various promissory notes, the debtor would pay TGSLC $163 per month for twenty years, and Regents $168 per month for ten years. Thus, during the first ten-year repayment period, he would be required to pay $331 per month on his student loan debt.

A Bankruptcy Specialist for Regents testified that the debtor was eligible to refinance his student loan debt to the Creditors under the William D. Ford Direct Loan Program ("Ford Program"). Under the Ford Program, the debtor's debts to TGSLC and Regents would be consolidated, allowing him to make one monthly payment. The amount of that payment would depend on which one of four repayment options was used. Calculating the debtor's potential payments under each repayment option based on an income of $41,000, the Specialist testified that the debtor would be required to pay: (1) $450 per month for ten years under a standard repayment plan; (2) approximately $225 per month for twenty five years under one of two other extended payment schedules; or (3) $267 per month for thirteen and one-half years under a income contingent repayment program.

---

**5.** Transcript at 15, in App. at 52.

**6.** Transcript at 15, in App. at 52.

**7.** *Id.* at 15–16, in App. at 52–3.

**8.** *Id.* at 30, in App. at 67.

The Specialist stated that if the debtor refinanced his student loan debt under the Ford Program, his forbearance period would recommence, allowing him a new five-year period. Even if the debtor did not enter the Ford Program, the Specialist testified that Regents would put him into a forbearance status for up to three more years. The debtor stated that he did not investigate the Ford Program because he did not have the current income to make any payments on his student loan debt. Thus, depending on how debtor decided to proceed, at the time of trial, he could anticipate receiving between three and five years' additional deferral.

After the trial, the bankruptcy court entered Judgment in favor of the debtor, discharging the student loan debt. It concluded that excepting the student loan debt from discharge under § 523(a)(8) would impose an undue hardship on the debtor and his dependents because he did not presently have income to pay the debt. Both Creditors filed Notices of Appeal from the bankruptcy court's Judgment, and their appeals have been consolidated for appellate review.

## II. *Discussion*

■ Section 523(a)(8) excepts from the Chapter 7 discharge any debt "for an educational ... loan made, insured, or guaranteed by a governmental unit ... unless excepting such debt from discharge under this paragraph will impose an undue hard-ship on the debtor and the debtor's dependents[.]" [9] That the debtor's student loan debt owed to the Creditors falls within this section is undisputed. The only issue on appeal is whether the bankruptcy court erred in concluding that excepting the debt from discharge under § 523(a)(8) will impose an "undue hardship" on the debtor and his dependents. This is a question of law that we review *de novo*,[10] giving no deference to the bankruptcy court's "undue hardship" conclusion.[11] In so doing, we conclude that the bankruptcy court erred in discharging the debtor's student loan debt.

■ The phrase "undue hardship" is not defined in the Bankruptcy Code. In *Educational Credit Management Corp. v. Polleys (In re Polleys)*,[12] the Court of Appeals for the Tenth Circuit adopted, with some limitations, a test originally established by the Second Circuit in *Brunner v. New York State Higher Educ. Servs. Corp.*[13] for determining whether repayment of student loans imposes an "undue hardship" within the meaning of § 523(a)(8). Under the "*Brunner* test," the debtor must prove by a preponderance of the evidence:[14]

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is

9. 11 U.S.C. § 523(a)(8).

10. *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1305–06 (10th Cir.2004) (citing *Woodcock v. Chemical Bank, NYSHESC (In re Woodcock)*, 45 F.3d 363, 367 (10th Cir.1995)), quoted in *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 308 B.R. 495, 502–03 (10th Cir. BAP 2004).

11. *See, e.g., Salve Regina College v. Russell*, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (*de novo* review means that "no form of appellate deference is acceptable").

12. 356 F.3d at 1309.

13. 831 F.2d 395 (2d Cir.1987).

14. *Alderete*, 308 B.R. at 503; *see Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.[15]

A student loan debt is nondischargeable under § 523(a)(8) if the debtor fails to show any one prong of this test.[16]

Although the Tenth Circuit adopted the *Brunner* framework, it expressly shunned "overly restrictive interpretation[s]" of the test that "deny discharge [of student loan debt] under even the most dire circumstances."[17] In the Tenth Circuit, therefore, courts have "discretion to weigh all the relevant considerations" within the framework of the *Brunner* test, applying the terms of the test "such that debtors who truly cannot afford to repay their loans may have their loans discharged."[18]

■ Exercising *de novo* review, we conclude that the debtor failed to demonstrate "undue hardship" because prongs (2) and (3) of the *Brunner* test, as adopted in *Polleys*, have not been proven.

1. *The debtor failed to show that additional circumstances exist indicating that his current state of affairs is likely to persist for a significant portion of the student loan debt repayment period.*

■ To sustain the second prong of the *Brunner* test, the debtor needed to show that additional circumstances exist indicating that his current state of affairs is likely to persist for a significant portion of the student loan repayment period.

Thus, under this prong, the court analyzes "all the facts and circumstances that affect the debtor's future financial position."[19] In *Polleys,* the Court of Appeals stated:

[The second prong] properly recognizes that a student loan is "viewed as a mortgage on the debtor's future." However, in applying this prong, courts need not require a "certainty of hopelessness." Instead, a realistic look must be made into debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like. Importantly, "courts should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism," and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan.[20]

The court in *Polleys* added that "additional circumstances" does not require a horrific event or condition, but that "undue hardship is something more than inconvenience or doing without luxuries ... 'the discharge of a student loan should be based upon an inability to earn and not simply a reduced standard of living.' "[21]

Here, "a realistic look into the debtor's circumstances" does not suggest that he will be unable to earn income in the foreseeable future that would allow him to repay his student loan debt, either pursuant to current repayment terms or under the Ford Program. In fact, the evidence indicates just the opposite. At the time of trial, his obligation to pay remained de-

15. *Brunner,* 831 F.2d at 396, *quoted in Polleys,* 356 F.3d at 1307.

16. *Polleys,* 356 F.3d at 1307.

17. *Id.* at 1308.

18. *Id.* at 1309.

19. *Id.*

20. *Id.* at 1310 (citations omitted).

21. *Id.* at 1306 (quoting *Cuenca v. Dept. of Educ.,* No. 94–2277, 1995 U.S.App. LEXIS 24025 at *5, 1995 WL 499511 at *2 (10th Cir. Aug.23, 1995)).

ferred and he had at least three additional years' deferment in prospect. Were Azwar to enter the Ford Program, his deferment period would be extended by five years. Azwar is healthy, well-educated, and employed. While he currently only has a $21 monthly surplus, he states that his income will increase by two percent each year, even if he is not promoted. Realistically, therefore, at the end of a three or five-year forbearance period, the debtor will have increased his income by six to ten percent. His income may increase "significantly" more if he is promoted. In the words of the *Polleys* court, these are "specific articulable facts, not unfounded optimism" upon which we may safely conclude that his current state of affairs may well change within the repayment period. Azwar lacks the requisite "inability to earn" that *Polleys* requires.

2. *The debtor has failed to prove "good faith".*

■ The final prong of the *Brunner* test requires the debtor to show that he has made good faith efforts to repay his student loans. While the Tenth Circuit has adopted *Brunner*, it makes clear in *Polleys* that it views this "good faith" prong more broadly than the Second Circuit.[22] Specifically, while a debtor's repayment efforts are one factor to consider in determining good faith, a debtor's "failure to make a payment, standing alone, does not establish a lack of good faith."[23] Even if a debtor makes no payments, good faith may exist.[24]

■ The focus of the good faith test in the Tenth Circuit, therefore, is not loan repayment, but rather "whether the debtor is acting in good faith in seeking the discharge" of student loan debt.[25] This test requires an examination of all of the circumstances of the case to determine the "legitimacy of the [debtor's] basis for seeking a discharge" of student loan debt.[26] It should not, however, "be used as a means for courts to impose their own values on a debtor's life choices."[27]

■ The Court of Appeals in *Polleys* resisted creating a "laundry list" of factors to determine whether a debtor has demonstrated "undue hardship,"[28] deciding instead that courts should be given wide discretion to consider "all the facts and circumstances" of a case within the framework of its version of the *Brunner* test.[29] Under its broader "good faith" test, however, the Court of Appeals articulated several specific factors that may be considered in determining whether a debtor is seeking to discharge his or her student loan debt in good faith, some of which overlap with considerations made in connection with the second, "additional circumstances," prong of the *Brunner* test. These factors are listed below.

(1) Is the debtor "intentionally creating his [or her] hardship"?[30] As part of this factor, courts may consider—

(a) whether the "debtor's unfortunate financial or personal circumstances are the result of factors

**22.** *See Alderete,* 308 B.R. at 502–03.

**23.** *Polleys,* 356 F.3d at 1311 (citation omitted).

**24.** *Alderete,* 308 B.R. at 504; *see Polleys,* 356 F.3d at 1311.

**25.** *Polleys,* 356 F.3d at 1309.

**26.** *Id.* at 1310.

**27.** *Id.*

**28.** *Id.* at 1309.

**29.** *Id.*

**30.** *Id., quoted in Alderete,* 308 B.R. at 504.

beyond his or her reasonable control," [31]

(b) whether the debtor "is actively minimizing current household living expenses and maximizing personal and professional resources," [32]

(i) in considering living expenses, courts may consider whether repayment of the debt will result in the debtor and any dependents doing without necessities, not just being "inconvenience[d]" or

experiencing " 'a reduced standard of living[,]' " [33]

(ii) in considering whether a debtor is maximizing resources, courts may consider whether a debtor has a legitimate inability to earn resulting from factors such as a disability or medical condition

that prevents the debtor from maximizing income; [34] whether the debtor has chosen a lower paying job in his or her field for personal reasons; [35] whether work exists in the debtor's field or in any other field in which the debtor is capable of working; [36] whether wages in the debtor's field or any other field in which the debtor is capable of working are low; [37] and whether the debtor's skills are outdated and cannot be reasonably updated; [38]

(2) Is the debtor "willfully contriving" a hardship?; [39]

(3) Has the debtor cooperated with student loan creditors by making payments, negotiating payments, seeking deferment, or seeking con-

31.  *Alderete,* 308 B.R. at 504–05 (citing *Polleys,* 356 F.3d at 1311–12).

32.  *Polleys,* 356 F.3d at 1312; *see id.* at 1309, *quoted in Alderete,* 308 B.R. at 506.

33.  *Polleys,* 356 F.3d at 1306 (quoting *Cuenca,* No. 94–2277, 1995 U.S.App. LEXIS 24025 at *5, 1995 WL 499511 at *2), *quoted in Alderete,* 308 B.R. at 504; *see Polleys,* 356 F.3d at 1307 (debtors must be able to repay student loans and maintain a "minimal standard of living") (quoting Report of the Comm'n on the Bankr. Laws of the United States, H.R. Doc. No. 93–137, Pt. II § 4–506 (1973), *reprinted in* Collier on Bankruptcy, App. Pt. 4(c) at 4–710, 4–711 (15th ed. rev.2003)) [hereinafter "Commission Report"]; *Polleys,* 356 F.3d at 1310 (in discussing the "additional circumstances" prong of the *Brunner* test, the Court of Appeals stated that "the debtor's ability to provide for adequate shelter, nutrition, health care, and the like" should be considered).

34.  *Polleys,* 356 F.3d at 1311–12 (discussing debtor's inability to earn resulting from a mental health condition).

35.  *See id.* at 1306–07 & 1312 (intent of § 523(a)(8) is to discourage debtors from dis-

charging student loans and later embarking on lucrative careers, and a debtor who obtains a loan that enables him or her to earn greater income should not be discharged unless there is a showing of inability to earn).

36.  *See generally, id.* at 1306 (a debtor's inability to earn must be considered in undue hardship analysis); *id.* at 1307 (" 'ability to obtain, retain, and continue employment and the rate of pay that can be expected' " is consideration) (quoting Commission Report at 4–711); *id.* (discussing the facts in *Brunner,* the Court of Appeals noted that the debtor "did not recount to the court any specific jobs that she had sought and been refused, and did not attempt to find a job outside of her chosen field of work."); *Brunner,* 831 F.2d at 396–97 ("No evidence was presented indicating a total foreclosure of job prospects in her area of training."); *Alderete,* 308 B.R. at 506–07.

37.  *Alderete,* 308 B.R. at 506–07.

38.  *Id.; see generally, Polleys,* 356 F.3d at 1306–07 (discussing inability to earn).

39.  *Polleys,* 356 F.3d at 1310, *quoted in Alderete,* 308 B.R. at 504.

solidation of numerous loans?;[40] and

(4) Is the debtor "attempting to abuse the student loan system"?[41] As part of this factor, courts should be suspect of the debtor's good faith when a short period of time has lapsed between the debtor obtaining his or her degree and the bankruptcy filing, because § 523(a)(8) "was designed to remove the temptation of recent graduates to use the bankruptcy system as a low-cost method of unencumbering future earnings" that the debtor is capable of earning at least in part as a result of a degree earned with student loans.[42]

The application of each of these factors, and the weight afforded to any one of them is, as made clear in *Polleys*, within the discretion of the court considering the discharge request.

Based on all of the facts and circumstances of this case, and especially when considering factors (1) and (4) above, the debtor has failed to prove that he seeks a discharge of his student loan debt in good faith. We discuss factor (4) first, and then turn to factor (1).

Azwar seeks to discharge his student loan debt only three years after obtaining his Master's Degree. This relatively short period of time makes the good faith of his discharge request suspect. The time frame of the discharge request coupled with the fact that Azwar failed to show that he is unable to earn sufficient income to support himself and his family and repay his student loan debt at the expiration of applicable deferment periods[43] leads us to conclude that he is not seeking a discharge in good faith.

Additionally, Azwar has not shown that he is actively maximizing his personal and professional resources. For example, there was no evidence as to whether Azwar has attempted to find work in his field outside of Hertz or in any other field in which he is capable of working; whether based on an actual job search, Azwar could not obtain higher paid work in Oklahoma City or elsewhere;[44] that his Master's Degree does not aid him in obtaining higher income, or that his skills are outdated; or that his spouse does not have the present skills to earn income in excess of child care costs. Instead, Azwar testified that he did not want to move from Oklahoma City even though he would be paid more in Dallas, and that he did not "feel like" obtaining employment outside of Hertz. To be sure, these decisions (and the family's decision that the spouse stay at home and school the children) are "life choices" that *Polleys* warns us not to disrespect.[45] But, at the same time, Azwar has in no way shown that he is actively "maximizing personal and professional resources."[46]

---

40. *Polleys*, 356 F.3d at 1312; *see Brunner*, 831 F.2d at 397; *Alderete*, 308 B.R. at 507.

41. *Polleys*, 356 F.3d at 1312 (quoting *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir.1994)).

42. *Polleys*, 356 F.3d at 1306, *quoted in Alderete*, 308 B.R. at 505; *see Brunner*, 831 F.2d at 397 (debtor's student loan debt nondischargeable in large part because she sought discharge only ten months after her graduation).

43. *See* discussion *supra* at 172.

44. Azwar testified that he did not know of any other jobs where he would be paid significantly more than at Hertz. These comments were made without any foundation, and therefore they are not persuasive because we do not know if they are based on an actual job search or are merely what Azwar has guessed to be true.

45. *Polleys*, 356 F.3d at 1310.

46. *Id.* at 1312.

Finally, Azwar has not in any way demonstrated that his family is "actively minimizing current household living expenses" in accordance with *Polleys*.[47] The bankruptcy court found that the family's expenses were reasonable. However, good faith requires something more than maintaining reasonable expenses. Azwar did not indicate that his family is experiencing "something more than inconvenience or doing without luxuries."[48] In fact, he did not even establish an inconvenience, other to allude to the fact that he incurred large credit card balances prepetition because his family could not live on his income. Absent evidence that repayment of his student loan debt will require his family to do without basic necessities, good faith has not been shown because "undue hardship" is more than "simply a reduced standard of living."[49]

### III. *Conclusion*

For the forgoing reasons, the bankruptcy court's Judgment is REVERSED and the Creditors' student loans are excepted from debtor's discharge.

---

47. *Id.*

48. *Id.* at 1306.

49. *Id.; Alderete,* 308 B.R. at 506 ("merely showing a reduced standard of living will not suffice to discharge a student loan debt").